UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DEBORAH DEFFAA,

                              Plaintiff,

        – against –

PIVOTEL AMERICA, INC., and PIVOTEL
GROUP PTY LIMITED,

                              Defendants.

**OPINION & ORDER**

20 Civ. 5466 (ER)

Ramos, D.J.:

        Deborah Deffaa has brought this action against Pivotel America, Inc. and Pivotel Group

Pty Limited (collectively "Pivotel"), alleging breach of contract and seeking a declaratory

judgment.  Her claims are predicated on Pivotel's failure to pay an "Earnout Payment" she is

allegedly owed, stemming from a 2019 stock purchase agreement between the parties.  Before

the Court is Deffaa's motion to dismiss two of Pivotel's counterclaims and to strike one

affirmative defense.  For the reasons set forth below, Deffaa's motion is GRANTED.

        I.        **BACKGROUND**

                A.        **The Stock Purchase Agreement and Related Transactions**

        Deffaa is the former owner of several companies that provide satellite

telecommunications services and equipment (collectively, the "Transferred Companies").[1]  Doc.

1, Complaint ¶ 11.  Pivotel America is a Delaware corporation and wholly owned subsidiary of

Pivotel International Pty Ltd., which in turn is a wholly owned subsidiary of Pivotel Group Pty

---

[1] The Transferred Companies are MVS USA, Inc., DebCom Incorporated and JMaxITC, and their respective
subsidiaries.

Ltd., an Australian owned satellite and mobile communications business.  Doc. 21, Amended Answer and Counterclaims, ¶¶50–53.  On July 1, 2019, Deffaa entered into a Stock Purchase Agreement ("SPA") with Pivotel America to sell her 100% interest in the Transferred Companies.  Doc. 1 ¶ 12.  On the same day, Pivotel International Pty Ltd. entered into a separate agreement with Deffaa to purchase from her 100% of the issued and outstanding share capital of MVS Trading House Netherlands B.V. ("MVS Netherlands").  Doc. 21 ¶55.  Finally, on the same day, Deffaa entered into an agreement with MVS USA, one of the Transferred Companies, to provide consulting services.  *Id.* ¶56.

Under the SPA, the purchase price for the Transferred Companies was determined as follows:  (a) $4,979,833.70, (b) plus or minus a working capital adjustment, (c) plus an "Earnout Payment" of up to $2 million.  Doc. 1 ¶13.  The SPA provided that the Earnout Payment be calculated based on the proportion of gross revenue earned by the Transferred Companies and MVS Netherlands in the year following the transaction, compared to certain benchmark revenue projections.  *Id.* ¶14.  Deffaa's maximum possible Earnout Payment under the SPA would be $2 million if gross revenue met the benchmark, but proportionally less if the benchmark was not met.  *Id.*  However, if gross revenue fell below $9,848,000 for the calendar year 2019, Deffaa would receive no Earnout Payment at all.  *Id.*

As part of the SPA, Deffaa also provided Pivotel with a Seller Disclosure Letter.  *See* Doc. 28-1.[2]  This letter listed the World Bank Group, IBRD ("World Bank") as one of the major customers of MVS USA, one of the Transferred Companies.  *Id.* § 4.19.  As part of the SPA,

---

[2] All extrinsic documents cited in this Opinion were referred to directly or otherwise relied upon by the parties in their pleadings, and are therefore incorporated by reference by, or integral to, the Amended Counterclaims.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002).  Neither party has objected to the other's reliance on the documents cited in the record.

Deffaa also provided certain warranties related to this customer list.  For example, she provided that:

> [T]here has not been any change, event, development, circumstance, occurrence or effect that, individually or taken together with all other effects has had or is reasonably likely to have a Material Adverse Effect and [that] none of the Companies has discontinued any material portion of its business.

Doc. 24-1 § 4.11(c)–(d).

She further provided that:

> Except as set forth on Section 4.19 of the Seller Disclosure Letter, since January 1, 2018, no Major Customer or Major Supplier has terminated its relationship with any Company or materially reduced or changed the pricing or other terms of its business with any Company and, to the Knowledge of Seller, no Major Customer or Major Supplier has notified any Company that it intends to terminate or materially reduce or change the pricing or other terms of its business in a manner adverse to such Company in any material respect.

*Id.* § 4.19(b).

Finally, she provided that:

> No representation or warranty by Seller contained in this Agreement contains any untrue statement of material fact or omits to state any material fact necessary, in light of the circumstances under which it was made, in order to make the statements herein not misleading.

*Id.* § 4.21.

The SPA also included a no oral modification clause, which provided as follows:  "This Agreement may be amended, modified or supplemented only by a written agreement executed and delivered by Seller and Buyer."  *Id.* § 10.10.

### B.  Pivotel's Notice of Breach and The MVS Communications Transaction

On August 13, 2019, Pivotel served on Deffaa a notice of breach of the SPA.  Doc. 28-2. It asserted that, despite the inclusion of the World Bank as one of MVS USA's major customers in the Seller Disclosure Letter, the World Bank had terminated its agreement with MVS USA on

June 20, 2019 (before the SPA was executed).  *Id.* at 1.  Pivotel alleges that Deffaa's failure to

disclose this fact violated at least §§ 4.11, 4.19 and 4.21 of the SPA, as set forth above, and

demanded that Deffaa indemnify it for losses associated with this alleged breach of warranty.

In a response dated August 20, 2019, Deffaa contested the loss figures cited by Pivotel.

Doc. 24-4 at 2.  She also stated that the World Bank had not terminated its agreement, but rather

that MVS USA had lost a bid.  *Id.*  However, she argued that there was a "new business

opportunity" that she could bring to Pivotel that would "mitigate any loss of revenue from World

Bank," and "retain and increase the value of Pivotel's key vendor relations."  *Id.*; *see also* Doc.

21 ¶79.  She suggested that, if she could facilitate this deal, it would "make[] Pivotel feel whole

and both sides equitably compensated."  *Id.*

Under the proposed deal, MVS Netherlands (a company now under Pivotel's control

pursuant to the parties' July 1, 2019 agreement) would agree to purchase certain assets from

MVS Communications, Ltd. ("MVS Communications").  *Id.* ¶75.  Despite its trade name, MVS

Communications was a third-party company not under Deffaa's control, but rather under the

control of Deffaa's personal acquaintance, Valery Bogdanov.  *Id.* ¶76.  The parties began

negotiations surrounding this transaction soon thereafter, with Deffaa communicating directly

with Robert Sakker, a Pivotel executive.

On August 21, 2019, Deffaa offered a possible framework for the deal, and suggested

that, based on the revenue she anticipated the transaction would yield for Pivotel, her facilitation

of the transaction "provides a positive margin and allowing that it does not go into an earn out,

provides separate revenue for compensation to me."  *Id.* ¶81.  Pivotel alleges that Deffaa's

reference to "separate revenue for compensation to me" referred to her expectation of a

commission for facilitating the transaction, in lieu of having the revenue go toward her Earnout

4

Payment.  *Id.* ¶82.  Sakker responded on August 25, 2019, stating that he was proposing a

"straight swap of MVS [Communications] for [World Bank] – no additional payments other than

to [Valery Bogdanov] and we can discuss the consultancy."  *Id.*  The "consultancy" referred to

the parties' July 1, 2019 agreement wherein Deffaa would provide consulting services to MVS

USA.  *Id.* ¶56.

On August 27, 2019, Deffaa suggested that Sakker "put [his] offer into a legal document

to close the [World Bank] breach issue," but indicated that she would "agree [to the proposal in

Sakker's prior email] so long as I am removed from the consulting agreement."  *Id.* ¶84.  Over

the next several days, Deffaa and Sakker communicated about several details of this proposed

transaction.  At least throughout the negotiation period in August 2019, the parties appear to

have viewed this deal as part of the settlement of the World Bank dispute.  For example, in an

email exchange dated August 28, 2019, Deffaa requested that the parties "close our open issue

regarding [the World Bank] before you move forward with MVS [Communications]," to which

Sakker replied "I have instructed our lawyers to move quickly.  I agree it is a package deal."

Doc. 28-3 at 4.

The MVS Asset Purchase Agreement ("MVS Agreement") was completed thereafter, and

the executed version is dated September 1, 2019.  Doc. 24-6.  While Deffaa facilitated the

transaction, she was not a party to it, as the signed MVS Agreement was solely between MVS

Communications and MVS Netherlands.  Through the MVS Agreement, MVS Netherlands

agreed to purchase certain assigned contracts, customer accounts and data from MVS

Communications.  *Id.* § 1.1.   The deal also included a provision that, for 60 months following

the Agreement, MVS Netherlands would pay MVS Communications 50% of revenues over costs

for the assets acquired, up to $1,000,000.  Doc. 21 ¶91.

C.       **The World Bank Settlement Agreement**

For reasons that are not clear from the record, the MVS Agreement was completed before

any formal resolution was reached on the World Bank issue between Deffaa and Pivotel.  The

next correspondence before the Court is a November 6, 2019 email in which Deffaa made an

offer to Sakker, stating that based on her calculations she would be owed an earnout payment of

"well over a million dollars."  Doc. 24-7 at 3.  She suggested that the parties "agree to drop all

mutual claims now and future . . . and exchange no monies."  She further added that as part of

this proposal, she would "walk away from the earn out and future claims."  *Id.*

Deffaa followed up with Sakker and another Pivotel representative later that day.  She

stated again that she proposed the parties "walk away from the Pivotel agreement and

relationship."  *Id.* at 2.  To support this proposal, she stated that "I have delivered MVS

Communication[s] as I gave you my word I would," and argued that "the value for MVS

[Communications] per your statements is $1.4M, equivalent to [the estimated damages stemming

from the alleged World Bank breach]."  Sakker responded that Pivotel was "walking through the

working capital adjustment in our scheduled meeting … today with your accountant.  You will

have a clearer understanding of our position at the end of that meeting."  *Id.*  This is an apparent

reference to a separate, contemporaneous dispute between the parties regarding the appropriate

purchase price adjustment for the SPA.

Deffaa, Pivotel, and MVS USA (one of the Transferred Companies) ultimately entered

into an agreement dated November 25, 2019 to settle the World Bank breach allegations, as well

as two other outstanding disputes (the "Settlement Agreement").  Doc. 21 ¶ 90.  As part of the

Settlement Agreement, Pivotel agreed to release Deffaa from any claims relating to the World

Bank's termination of its contract with MVS USA.  Doc. 24-8 at § 5(b).  Section 3 of the

Settlement Agreement also terminated Deffaa's consultancy with MVS USA, providing that it pay her $42,000.  *Id.*  Finally, the Settlement Agreement resolved the parties' dispute about the proper working capital figure under the SPA, and provided for a purchase price adjustment "owing by Deffaa to Pivotel [of] $332,069.50."  *Id.* § 2.  Thus, combining the above exchanges of monies, the Settlement Agreement provided that Deffaa owed Pivotel a "Net Settlement Payment" of $290,069.50.  *Id.* § 4.

The Net Settlement Payment was couched as being made "in satisfaction of the Purchase Price Adjustment and [consulting agreement] Termination Payment."  *Id.*  However, the recitals to the Settlement Agreement also noted that the parties had been disputing "Pivotel's claim for indemnification under the [SPA] relating to the World Bank Bid," in addition to the purchase price adjustment and consulting agreement issues, and that the Settlement Agreement was intended to "resolve these disputes."  *Id.* at 2.  The Settlement Agreement also provided that each party released each other, "except as to the obligations created by this Agreement . . . from any and all claims . . . in each case relating to the termination of the Consulting Agreement, World Bank Bid or the Final Working Capital determination under the Stock Purchase Agreement." Doc. 24-8 at § 5.  It further noted that "the Claim Notice relating to the World Bank Agreement and its termination, is hereby withdrawn and of no further force and effect," conditioned on the receipt of the $290,069.50 Net Settlement Payment.  *Id.*  Finally, it provided that "[t]his agreement constitutes the entire agreement and understanding between the Parties on the subject matter above and merges all prior discussions and negotiations between the parties.  This Agreement may be amended or modified only by a writing signed by all Parties."  *Id.* § 11.

###### D.        Procedural History

Deffaa brought this case on July 16, 2020, alleging that Pivotel had breached the SPA by wrongfully refusing to provide her with any Earnout Payment, or with any documents to calculate what is due to her under the Earnout Payment.  Doc. 1 ¶1.  She alleges that Pivotel has instead taken the position that its 2019 revenue never met the $9,848,000 threshold to trigger any Earnout Payment.  *Id.* ¶2.  The Complaint alleges that Pivotel's position violates several terms of the SPA.  *Id.* ¶36.

Pivotel answered and asserted counterclaims on August 28, 2020, which it amended on October 22, 2020 following a pre-motion conference with the Court.  Doc. 21.  As relevant here, it asserted a counterclaim seeking a declaration that "pursuant to the terms of the Stock Purchase Agreement and subsequent agreements, [Deffaa] is not entitled to an Earnout Payment."  *Id.* ¶99.  It also asserted a counterclaim for promissory estoppel, alleging that Deffaa had agreed that any revenue from the MVS Communications transaction would not go toward the calculation of her Earnout Payment, and that she should be estopped from claiming otherwise.  *Id.* ¶¶104, 114.[3] Deffaa moves to dismiss these counterclaims, as well as to strike Pivotel's third affirmative defense, which provides that "[Deffaa's] claims are barred, in whole or in part, by the doctrines of estoppel, waiver, ratification and unclean hands."  *Id.* ¶43.  Pivotel also asserted three other counterclaims, which Deffaa has not moved to dismiss.

---

[3] The Court will refer to such revenue as "MVS Communications revenue" for simplicity, though it is more precisely MVS Netherlands' revenue from certain of MVS Communications' assets, which MVS Netherlands—and thus Pivotel—acquired through the MVS Agreement.

## II.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 557).  However, this "flexible 'plausibility standard'" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (citation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss.  *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).  "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal citations and quotation marks omitted).

Accordingly, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014); *see also Twombly*, 550 U.S. at

556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof

of those facts is improbable . . . ."). "For purposes of this rule, the complaint is deemed to

include any written instrument attached to it as an exhibit or any statements or documents

incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.

2002) (internal quotation marks omitted).

Federal Rule of Civil Procedure 12(f) allows a district court to "strike from a pleading an

insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." To prevail

on a motion to strike, the moving party must satisfy a stringent three-pronged test: "(1) there

must be no question of fact that might allow the defense to succeed; (2) there must be no

substantial question of law that might allow the defense to succeed; and (3) the plaintiff must be

prejudiced by the inclusion of the defense." *Specialty Minerals, Inc. v. Pluess–Staufer AG*, 395

F. Supp. 2d 109, 111 (S.D.N.Y. 2005). In considering the first and second prongs, courts apply

the same legal standard as a motion to dismiss under Rule 12(b)(6), insofar as the defense's

sufficiency is to be determined solely on the face of the pleadings and the court "accepts as true

all well-pleaded factual allegations and draws all reasonable inferences in the [non-moving

party's] favor." *Coach, Inc. v. Kmart Corps*, 756 F. Supp. 2d 421, 425 (S.D.N.Y. 2010).

However, affirmative defenses are not required to be based only on facts, and may be "of a

factual, legal or equitable nature." *Eunhasu Corp. v. NorGuard Ins. Co.*, No. 19 Civ. 7696 (ER),

2020 WL 5513159, at *4 (S.D.N.Y. Sept. 14, 2020).

### III.    DISCUSSION

#### A.    Pivotel's Promissory Estoppel Counterclaim is Barred by the Settlement Agreement's Merger Clause

The Court will first address Pivotel's promissory estoppel counterclaim, as this is the

focus of Deffaa's arguments. Pivotel has alleged that the parties previously agreed that any

revenue from the MVS Communications transaction would not be counted toward Deffaa's

Earnout Payment calculation, citing "emails[] and accompanying discussions."  Doc. 21 ¶86.  It

argues that it released the World Bank claim for indemnification against Deffaa in reliance on

this agreement.  Pivotel's therefore seeks an order estopping Deffaa from denying that such

money is exempt from the Earnout Payment calculation.  *Id.* ¶113.  Deffaa moves to dismiss this

counterclaim on the ground that it is barred by the Settlement Agreement's merger clause.  Doc.

23 at 10.  The Court agrees.

Under New York law, the presumptive rule is that "[a] completely integrated contract

precludes extrinsic proof to add to or vary its terms."  *Primex Int'l Corp. v. Wal-Mart Stores*, 89

N.Y.2d 594, 600 (1997).  This rule applies to "oral and written evidence alike."  *Topps Co., Inc.

v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 69 (2d Cir. 2008).  A party seeking to overcome this

presumption faces a "high bar."  *End Line Investors, Ltd. v. Wells Fargo Bank, N.A.*, 16 Civ.

7009 (PGG), 2018 WL 3231649, at *4 (S.D.N.Y. Feb. 27, 2018) (citing *Lee v. Joseph E.

Seagram & Sons, Inc.*, 552 F.2d 447, 452 (2d Cir. 1977)).

An integration clause will bar consideration of parol evidence to vary its terms unless

such evidence is "collateral" to the written agreement.  *Id.*  Three conditions must exist for such

an agreement to be collateral:  "(1) The agreement must in form be a collateral one; (2) it must

not contradict express or implied provisions of the written contract; [and] (3) it must be one that

parties would not ordinarily be expected to embody in the writing."  *Gem Corrugated Box Corp.

v. National Kraft Container Corp.*, 427 F.2d 499, 502 (2d Cir. 1970) (quoting *Mitchill v. Lath*,

247 N.Y. 377, 380-81 (1928)).  A collateral agreement "must not be so clearly connected with

the principal transaction as to be part and parcel of it."  *Id.* at 502–03 (internal quotation marks

omitted).  Accordingly, the Court will assess whether the emails relied upon by Pivotel support

11

the existence of a collateral agreement sufficient to modify the fully integrated Settlement
Agreement; if no such collateral agreement exists, the Settlement Agreement is enforceable and
bars Pivotel's counterclaim for promissory estoppel. *See Security Plans, Inc. v. CUNA Mut. Ins.
Soc.*, 769 F.3d 807, 816 (2d Cir. 2014) ("As a general matter, a party may not maintain a
promissory estoppel claim where the promises on which the claim is based are expressly
contradicted by a later written agreement covering the same subject matter.") (internal citations
and quotation marks omitted).

Pivotel cites to three separate emails to support the existence of an agreement to waive
Deffaa's right to Earnout Payment revenue stemming from the MVS transaction.  First, it notes
that Deffaa's August 21, 2019 email proposed that revenue from MVS Communications would
"not go into an earn out."  Doc. 27 at 19.  Second, it notes that, as negotiations continued in the
following days, Pivotel suggested that the MVS transaction would be part of a "straight swap of
MVS [Communications] for [the World Bank] –no additional payments other than to [Valery
Bogdanov] and we can discuss the consultancy," to which Deffaa responded  "I agree as long as
I am removed from the consulting agreement."  *Id.*  Finally, it refers to the November 6, 2019
email in which Deffaa wrote "I have delivered MVS Communications as I gave you my word I
would . . . The value for MVS [Communications] per your statements is $1.4M, equivalent to
your original [World Bank] claim number."  *Id.*  Pivotel argues that the value for the MVS
Communications revenue could only be equivalent to the World Bank claim, as Deffaa suggests
in her email, if its revenue did not count toward Deffaa's Earnout Payment.  *Id.*

Both parties have focused their arguments on the third prong of the *Gem Corrugated Box*
test:  whether "the parties would not ordinarily be expected to embody [Deffaa's alleged
promise] in the [Settlement Agreement]."  427 F.2d at 502.  The Court agrees that this is the

"primary consideration" and thus begins its analysis there.  *See DDCLAB Ltd. v. E.I. DuPont De Nemours and Co.*, No. 03 Civ. 3654 (GBD), 2005 WL 425495, at *4 (S.D.N.Y. Feb. 18, 2005). Deffaa argues that it would be highly unusual for the parties to omit from the Settlement Agreement any reference to her willingness to forgo her right to apply MVS Communications revenue toward the Earnout Payment, given that Pivotel has alleged that her purported promise to do so was the very reason it released the World Bank claims against her.  Doc. 23 at 13. Pivotel has responded that the MVS transaction was not mentioned because it was consummated by different parties,[4] and because the "financial terms of the Settlement Agreement . . . dealt only with the working capital and Consulting Agreement issues."  Doc. 27 at 23.

Deffaa has the better argument.  As a threshold matter, Courts routinely decline to categorize promises as "collateral" when they relate to the subject matter of the principal transaction and would constitute part of the consideration thereof.  *See DDCLAB Ltd.*, 2005 WL 425495, at *4.  Here, Pivotel alleges that it released the World Bank claims against Deffaa in reasonable and detrimental reliance on her agreement that the MVS Communications revenue would be excluded from the Earnout Payment calculation, and that it "would not have entered into the Settlement Agreement but for" this promise.  Doc. 21 ¶¶ 104, 107.  If this alleged agreement indeed formed such an important part of Pivotel's release of the World Bank claims, one would expect it to be included in the Settlement Agreement, which is the instrument formally releasing all claims relating to the World Bank breach and setting forth Deffaa's obligations in exchange.  *See DDCLAB Ltd.*, 2005 WL 425495, at *4 (noting that when a party was alleged to have taken on an additional obligation in consideration of a written contract,

---

[4] Signatories to the MVS Agreement were MVS Communications and MVS Netherlands, whereas signatories to the Settlement Agreement were Defaa, Pivotel America Inc., and MVS USA.  *See* Docs. 24-6, 24-8.

"reasonable businesspeople would therefore anticipate" that obligation to be included in the contract); *see also Dujardin v. Liberty Media Corp.*, 359 F. Supp. 2d 337, 355–56 (S.D.N.Y. 2005) (evidence of additional consideration for entering into an employment agreement was precluded by parol evidence rule).

Pivotel argues that Deffaa's promise was collateral to the Settlement Agreement because the MVS Agreement was consummated by different parties than those that signed the Settlement Agreement, and the MVS transaction itself is nowhere mentioned in the Settlement Agreement. However, this argument is a red herring, because Pivotel's counterclaim is based on an alleged agreement that *was* between the parties:  Deffaa's purported promise, to Pivotel, to waive her right to have the MVS Communications revenue counted toward her Earnout Payment calculation.[5]  Thus, there was nothing prohibiting the parties from including this promise in the Settlement Agreement along with the other conditions related to the parties' release of claims regarding the World Bank dispute.  *See* Doc. 24-8 at §5 (releasing Deffaa from all claims relating to, *inter alia*, the World Bank dispute, and providing that such release is "except as to the obligations created by this Agreement").

Similarly, the Court acknowledges that the Settlement Agreement provides that Deffaa agreed to pay Pivotel the Net Settlement Amount "[i]n satisfaction of the Purchase Price Adjustment and the [Consulting Agreement] Termination Payment," without any mention of estimated damages stemming from the alleged World Bank breach.  *Id.* §§ 2–4.  However, this does not change the fact that, under the plain terms of the Settlement Agreement, all parties released each other from all claims relating not just to the working capital and consulting

---

[5] In any event, this promise is not reflected in the MVS Agreement either.  *See* Doc. 24-6.

agreement disputes, but also from the World Bank dispute.[6]  Thus, regardless of how the Net

Settlement Amount was calculated, the Settlement Agreement as a whole provides that Deffaa

pay Pivotel $290,069.50, and that all parties would release their claims against each other

regarding the aforementioned disputes (except, the contract states, "as to the obligations created

by this Agreement.").  *Id.* § 5.  Thus, Deffaa's alleged additional promise cannot be said to be

"collateral" to the Agreement—rather, any such promise, if it were intended as a necessary

condition of the release of the World Bank claims, would instead be "so clearly connected with

the principal transaction as to be part and parcel of it."  *Gem Corrugated Box*, 427 F.2d at 502–

03.[7]

Finally, contrary to Pivotel's suggestion, the Second Circuit's decision in *Gem*

*Corrugated Box* does not require a different outcome.  *See* 427 F.2d 499 (2d Cir. 1970).  In *Gem*

*Corrugated Box*, the plaintiff, a paper manufacturer, entered into a written contract to purchase

raw materials for the production of boxes from the defendant at a price that was "not attractive,"

and the contract included a merger clause.  *Id.* at 502.  The plaintiff separately alleged that it had

reached an oral agreement to purchase stock in the defendant's company, and that the stock sale

agreement was the reason the plaintiff had agreed to the unfavorable terms of the box materials

contract.  *Id.*  The plaintiff sued when the defendant subsequently refused to sell stock pursuant

---

[6] In its recitals, the Agreement also purports to resolve several disputes, which include Pivotel's "claim for indemnification . . . relating to the World Bank bid."  Doc. 24-8 at 2.

[7] The Court also acknowledges Pivotel's argument that the Settlement Agreement would make significantly more economic sense if the Net Settlement Payment were made solely in consideration of resolving the respective working capital and consulting agreement disputes (as well as its similar argument that the MVS transaction would make more economic sense if no MVS Communications revenue went toward the Earnout Payment).  However, while the consideration for these respective transactions may have been *unfavorable* in the absence of Deffaa's alleged agreement, Pivotel has not argued—nor could it—that either contract is void for lack of consideration altogether.  Thus, the Court is bound to enforce these contracts as they are written.  *See Apfel v. Prudential-Bache Sec. Inc.*, 81 N.Y.2d 470, 476 (1993) (absent fraud or unconscionability, adequacy of consideration is not a proper subject for judicial scrutiny).

to the agreement; the defendant, however, argued that evidence of the sale was precluded by the fully integrated box sale contract. *Id.* at 502–03. The court found that the stock agreement was collateral to the box materials contract and permitted extrinsic evidence of its existence. However, the court's decision was predicated on the fact that "the parties ordinarily would not embody the stock purchase agreement in a writing concerned only with box materials purchase terms." *Id.* at 503 (noting also that the box contract's merger clause addressed "its limited subject matter alone."). Here, however, the subject matter of the agreements is not so readily separable because Pivotel seeks to rely on extrinsic evidence of an agreement to settle the World Bank dispute, while the Settlement Agreement itself *also* sets forth terms on which the World Bank dispute would be released. Thus, unlike the situation in *Gem Corrugated Box*, any promises made in exchange for the release of claims regarding the World Bank dispute would be expected to be included in the Settlement Agreement, and are not collateral.

For similar reasons, the Court finds that the second prong is not met. *See Gem Corrugated Box Corp.*, 427 F.2d at 502 (the collateral agreement must not contradict express or implied provisions of the written contract). Evidence of Deffaa's agreement to waive any right to apply MVS Communications revenue toward her Earnout Payment would conflict with the terms of the Settlement Agreement's merger clause, and its release of the World Bank breach claims. The merger clause provides that the Settlement Agreement "constitutes the entire agreement and understanding between the parties on the subject matter above," which includes Pivotel's promise to withdraw its claim notice relating to the World Bank dispute. *See* Doc. 24-8 at § 11, 5(b). Under similar circumstances, courts in this district have found that allegedly collateral agreements that "purport[] to place additional obligations" on a party regarding the same subject matter will violate a merger clause stating that there were no such additional

obligations.  *See End Line Investors*, 2018 WL 3231649, at *4; *see also See Dujardin*, 359 F.

Supp. 2d at 357 ("[T]he reception of evidence of the alleged promise . . . would contradict the

integration clause providing that the Merger Agreements contain the entire agreement between

the parties.").  In addition, the alleged agreement would appear to violate the Settlement

Agreement's release provision, which provides that the parties release each other "[e]xcept as to

the obligations created by this agreement."  Doc. 24-8 at § 5.

Deffaa, however, has not disputed that any such agreement regarding the Earnout

Payment, if it exists, would be collateral in form.  Thus, while the Court finds that, while any

purported promise to waive earnout proceeds stemming from the MVS transaction was not

collateral to the Settlement Agreement, the first condition set forth in *Gem Corrugated Box*—that

the agreement be "collateral in form"—would nevertheless be met.  *See* 427 F.2d at 502.

**B.      Pivotel's Promissory Estoppel Counterclaim is Also Barred by the
          SPA's No Oral Modification Clause**

Deffaa also argues the promissory estoppel counterclaim should be dismissed for the

independent reason that her alleged promise would violate the SPA's no oral modification

clause.  This clause provides that the "[SPA] may be amended, modified or supplemented only

by a written agreement executed and delivered by Seller and Buyer."  Doc. 24-1 at §10.10.

Pivotel proffers two arguments in response:  that the parties' emails constitute a written, not oral

modification of the SPA, and that, even if these emails did not constitute a written waiver, the

promissory estoppel claim should survive based on the doctrine of partial performance.

**i.      The Email Record Does Not Constitute a Written Modification
          of the SPA**

For its first argument, Pivotel points to the same emails discussed above, alleging that

they constitute an enforceable modification to the agreement.  Pivotel relies on the analogous

statute of frauds context, in which emails may constitute "writings" so long as they "designate all

parties, identify and describe the subject matter and state all of the essential terms of a complete

agreement . . . with reasonable certainty." *See Vioni v. Am. Capital Strategies Ltd.*, No. 08 Civ.

2950 (PAC), 2009 WL 174937, at *3 (S.D.N.Y. Jan. 23, 2009) (citation and quotation marks

omitted).  This of course is true.  However, while the first two emails referenced appear to show

the parties' preliminary agreement regarding the Earnout Payment and the MVS transaction,

these do not constitute "all of the essential terms of a complete agreement" because they

occurred in the context of ongoing negotiations regarding the terms of the entire deal.

Deffaa's first email, in which she proposes that the MVS Communications revenue "does

not go into an earn out," is explicitly framed as an offer.  Doc. 28-3 at 8.  Pivotel, however, cites

to Sakker's response that he desired a "straight swap of MVS [Communications] for [World

Bank] – no additional payments other than to [Valery Bogdov], and we can discuss the

consultancy," and Deffaa's subsequent reply that she "agree[d] as long as I am removed from the

consulting agreement," to argue that both parties agreed to the alleged waiver of any Earnout

Payment revenue from MVS Communications.  *Id.* at 6–7.  However, the available email record

shows that the parties continued to negotiate from there.  For instance, Deffaa followed up with

Sakker to request that a formal legal document be created, and Sakker agreed, stating that

"[g]iven we need to formally close out the dispute, I feel I need to get our lawyers to prepare the

asset sale agreement along with the release document."  *Id.* at 6.  In a subsequent email

discussing various financial terms of the MVS transaction, Deffaa further wrote that the parties

"will want to close our open issue regarding [the World Bank dispute] before you move forward

with MVS [Communications]," to which Sakker replied "I have instructed our lawyers to move

quickly.  I agree it is a package deal."[8]  *Id.* at 4.  For reasons that are not clear from the record,
however, a single "package deal" (or at least a written one) was never reached; rather the MVS
Agreement was consummated via a separate agreement between MVS Communications and
MVS Netherlands dated September 1, 2019, and the World Bank breach was settled via the
November 25, 2019 Settlement Agreement discussed above.

Pivotel also cites to a November 6, 2019 email in which Deffaa proposed that the parties
"walk away from the Pivotel agreement and relationship," and notes in support of this proposal
that "I have delivered MVS Communications as I gave you my word I would."  Doc. 24-7.   She
further states in the email that "the value for MVS [Communications] per your statements is
$1.4M, equivalent to your original [World Bank] breach claim number."  *Id*.  Pivotel argues that
the only way that the value of the MVS Communications transaction could be the "equivalent"
of Pivotel America's losses from the World Bank dispute would be if MVS Communications
revenue were *not* taken into account in calculating Deffaa's Earnout Payment.  Doc. 27 at 20.
This is based on a provision in the MVS Agreement providing that MVS Netherlands pay MVS
[Communications] 50% of revenues over costs for the assets acquired, up to $1,000,000, for
several years following the purchase.  Doc. 21 ¶91.  Pivotel thus argues that, under Deffaa's
theory, it would effectively be unable to profit from the MVS Communications transaction
because it would owe money stemming from the MVS Communications revenue both to Deffaa
and to MVS Communications.

This may be mathematically true, but Deffaa's email does not establish an agreement by
itself, because it is still clearly framed as a "proposal."  Doc. 24-7 at 2.  And while Pivotel

---

[8] The parties also appear to have continued to negotiate over the terms of the termination of the consultancy
agreement.  *See* Doc. 24-5 at 5.

suggests that the email should be "piec[ed] together" with the previously discussed emails to create an enforceable agreement, the remainder of the email thread suggests that, at this point, negotiations regarding all topics covered in the Settlement Agreement were ongoing.  *See id.* at 3 (showing that Deffaa proposed in an immediately preceding email that the parties "agree to drop all mutual claims now and future, close both Breach issues and [the working capital dispute] and exchange no monies");  *id.* at 2 (Deffaa threatened to "file formally for Breach for non-payment of the Consulting agreement" if the parties did not settle);  *id.* at 1 (Sakker informing Deffaa, in response to her "walk away" offer, that Pivotel would be "walking through the working capital adjustment" that afternoon and she would "have a clearer understanding of our position at the end of that meeting.").

Thus, while Pivotel is correct that none of these emails, nor other emails in the record, explicitly show a "deviation" from the purported understanding that Deffaa would waive Earnout Payment revenue from the MVS Communications transaction, the same emails also show that key terms of the agreement were still being negotiated, such as financial terms relating to the working capital adjustment and the terms on which the consulting agreement would be terminated.  Accordingly, the Court cannot find that "all the essential terms of a complete agreement" are set forth in the parties' email correspondence for it to constitute a valid written waiver of her right to apply MVS Communications revenue to the Earnout Payment calculation. *See Vioni*, 2009 WL 174937, at *3 (quoting *Carruthers v. Flaum*, 450 F. Supp. 2d 288, 308 (S.D.N.Y. 2006)).  Rather, the record before the Court shows only ongoing, fluid negotiations.

Pivotel also argues that its affirmative waiver defense could survive even if the Court finds that there is no written agreement amending the SPA, citing another provision of the SPA's no oral modification clause that permits unilateral waiver.  *See* Doc. 24-1 § 10.10 ("Any

obligation, covenant, agreement, or condition herein may be waived by the Party entitled to the benefits thereof only by a written instrument signed by the Party granting such waiver.")  This appears to be an alternative argument that the email record shows a unilateral waiver by Deffaa. It is true that a party may unilaterally waive a contract provision that solely exists to their benefit. Williston on Contracts § 39:24 (4th ed.).  However, as already discussed, the correspondence on which Pivotel seeks to rely shows preliminary discussions that were part of a bargained-for exchange between Deffaa and Pivotel regarding the World Bank breach dispute and other issues. Thus, any enforceable agreement stemming therefrom would constitute a modification of the SPA, not a unilateral waiver of Deffaa's rights.  *See John Street Leasehold LLC v. F.D.I.C.*, 196 F.3d 379, 382, n.2 (2d Cir. 1999) (noting, in reference to a discussion that "contain[ed] some give and take and trail[ed] off without a clear resolution," that any oral agreement would have been a bargained-for exchange constituting modification, not a unilateral waiver).

### ii.    The Settlement Agreement's Merger Clause Bars Consideration of the Partial Performance Doctrine

Pivotel also argues that, even if the record does not support a written waiver regarding Deffaa's Earnout Payment, its promissory estoppel claims would survive based on the doctrine of partial performance.  Under this doctrine, a party may be estopped from denying that an oral agreement existed if the party seeking enforcement has relied on the defendant's promise and performed some or all of the oral agreement.  *See Carruthers v. Flaum*, 450 F. Supp. 2d 288, 310 (S.D.N.Y. 2006).  The doctrine may be invoked if the partial performance is "unequivocally referrable" to the purported oral agreement.  *Id.* at 311 (citation omitted).  Actions taken in partial performance are unequivocally referrable to an oral agreement only if they are "unintelligible or at least extraordinary, explainable only with reference to the oral agreement." *Id.* (quoting *Anostario v. Vicinanzo*, 59 N.Y.2d 662, 664 (1983) (internal quotation marks

omitted)).  Pivotel argues that, for the reasons discussed above, the MVS transaction would have made no economic sense without Deffaa's alleged waiver of her right to Earnout Payment revenue stemming from it.  Thus, Pivotel argues that its causing MVS Netherlands to enter into the MVS transaction constituted partial performance of its obligations in reliance on Deffaa's promise.

Whatever the merits of this argument, it is also barred by the Settlement Agreement's merger clause.  As Deffaa notes in her moving brief, the partial performance exception does not apply when the alleged oral promise has been superseded by a merger clause in a subsequently executed agreement.  *See Clark Constr. Corp. v. BLF Realty Holding Co.*, 28 A.D.3d 367, 368 (1st Dep't 2006) ("The merger clauses in [Plaintiffs'] leases and the parol evidence rule bar the residential tenants from relying on their claimed part performance to take the alleged oral agreement out of the statute of frauds.");[9] *see also Little Nest Cmty Nursery LLC v. 501 Church LLC*, 50 Misc. 3d 1215(A), 2016 WL 400828, at *8 (N.Y. Sup. Ct. Jan. 29, 2016) (same, citing *Clark Const. Corp.*).  Pivotel did not respond to this argument in its opposition brief.  The Court therefore finds that the partial performance exception is inapplicable, and Pivotel's equitable estoppel counterclaim is dismissed.

---

[9] In *Clark*, several commercial tenants alleged that they had entered into an oral agreement with their landlord to purchase condominiums from him at a below-market rate.  *Id.* at 367.  They had also signed leases with the landlord, claiming they had an understanding that rent payments under the lease would actually be down payments for an eventual sale.  *Clark Constr. Corp. v. BLF Realty Holding Corp.*, No. 122622/00, 2004 WL 5752048 (N.Y. Sup. Ct. Nov. 24, 2004).  However, the leases included an integration clause and made no mention of a down payment for the eventual sale.  *Id.*  The First Department affirmed the trial court's finding that plaintiffs could not introduce evidence showing that their payment of rent under the leases was actually partial performance of a down payment for a contemplated sale.

## C.  Pivotel's Third Affirmative Defense is Stricken

Deffaa also argues that the Court should strike Pivotel's third affirmative defense, which asserts that "Plaintiff's claims are barred, in whole or in part, by the doctrines of estoppel, waiver, ratification and unclean hands."  Doc. 21 at ¶ 43.

Deffaa argues that this affirmative defense is "apparently based on [the] same theory" as Pivotel's promissory estoppel counterclaim discussed above, and that it should be stricken if Pivotel's counterclaim is rejected as a matter of law.  Doc. 23 at 9.  Pivotel does not directly dispute this in its opposition brief—rather, it (1) makes its waiver argument, *see* Doc. 27 at 19–22, which the Court has already addressed in relation to Deffaa's arguments regarding the Settlement Agreement and no oral modification clause in the SPA; and (2) references the estoppel counterclaim but does not make a distinct argument regarding the affirmative defense of estoppel.  *Id.* at 16, 21–22.

Because the Court has already found that there was no enforceable waiver of Deffaa's rights to her Earnout Payment, as discussed in detail above, it also finds that there is no "question of fact" or "substantial question of law" that might allow the affirmative defense to succeed.  *See Specialty Minerals, Inc.*, 395 F. Supp. 2d at 111.  Accordingly, the Court also finds that Deffaa would be prejudiced by the inclusion of the defense.  *See Coach, Inc. v. Kmart Corps*, 756 F. Supp. 2d 421, 425 (S.D.N.Y. 2010) (inclusion of a legally insufficient defense "prejudices the plaintiff because it will needlessly increase the duration and expense of litigation"); *see also Estee Lauder, Inc. v. Fragrance Counter, Inc.*, 189 F.R.D. 269, 272 (S.D.N.Y. 1999) (observing that when "the defense is insufficient as a matter of law, the defense should be stricken to eliminate the delay and unnecessary expense from litigating the invalid claim") (citations

omitted).  The same analysis applies to Pivotel's affirmative defense based on equitable estoppel, as discussed in Sections III.A–B, above.  Thus, based on the foregoing discussion, Pivotel's Third Affirmative Defense is stricken to the extent it raises arguments based on waiver or estoppel.

Unlike its invocation of the waiver defense, Pivotel makes no reference to any ratification or unclean hands defenses in its opposition brief.  As such, it has failed to respond to Deffaa's argument that these defenses are based on the same legal theories discussed above, and has abandoned any argument that there is a separate basis to assert these defenses.  *See Wilkov v. Ameriprise Fin. Servs. Inc.*, 753 F. App'x 44, 46 n.1 (2d Cir. 2018) (claim abandoned when it was not addressed in a party's opposition to a motion to dismiss); *see also Lipton v. Cty of Orange*, 315 F. Supp. 2d 434, 446 ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.").  Pivotel's third affirmative defense is therefore stricken in its entirety.

### D.    Pivotel's Declaratory Judgment Counterclaim is Dismissed

Pivotel has also sought a declaratory judgment that Deffaa is not entitled to an Earnout Payment pursuant to the SPA and subsequent agreements.  Doc. 21 ¶99.  Deffaa seeks to dismiss this counterclaim as the "mirror image" of the breach of contract claim that forms the basis of this case.  Doc. 23 at 20.  Pivotel argues that it is not just seeking a declaration of non-breach, but "affirmatively, a declaration that subsequent agreements between the parties modified the language contained in the Stock Purchase Agreement."  Doc. 27 at 23.

The Court will entertain a declaratory judgment claim "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations at issue," or "(2) when it will

terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Continental Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734, 737 (2d Cir. 1992) (citation omitted).  However, these factors are not met when a declaratory judgment counterclaim "[does] no more than mirror an extant claim in the same federal case." *Dubov v. Lewis*, 18 Civ. 3854 (PAE), 2019 WL 1060652, at *3 (S.D.N.Y. Mar. 6, 2019).

Here, to the extent Pivotel's declaratory judgment counterclaim would clarify or settle any outstanding legal issue that is not subsumed by Deffaa's primary breach of contract claim, it would be the question of whether there was an enforceable modification of the SPA.  However, the Court has already addressed this issue in Section III.B, above.

The Court also notes that Pivotel has alleged, in support of its declaratory judgment counterclaim, that Deffaa has wrongfully claimed that over $1 million in revenue from a contract with the Columbian Air Force should be taken into account in her Earnout Payment calculation, "even though such revenue was never, in fact, earned by any of the Transferred Companies." Doc. 21 ¶98.  However, dismissal of this counterclaim will not leave this issue unresolved, as Deffaa's primary declaratory judgment claim seeks "a judicial declaration that any Earnout Calculation must include revenue from the MVS Communications' contracts and the [Colombian Air Force] contract."  Doc. 1 ¶40.  Thus, to the extent Pivotel's declaratory judgment counterclaim is not duplicative of Deffaa's breach claim or Pivotel's own promissory estoppel counterclaim, it is duplicative of Deffaa's declaratory judgment claim.  Thus, there is no risk that any "discrete issue relating to any party's rights or responsibilities . . . has the potential to go unaddressed" if this counterclaim is dismissed.  *Dubov*, 2019 WL 1060652, at *3.  The Court therefore dismisses Pivotel's declaratory judgment counterclaim.

## IV.    CONCLUSION

For the foregoing reasons, Deffaa's motion to dismiss Pivotel's promissory estoppel and declaratory judgment counterclaims, and to strike its third affirmative defense, is GRANTED. The next conference in this case is scheduled for August 19, 2021 at 9a.m.  The parties are directed to dial (877) 411-9748 and enter access code 3029857# when prompted.  The Clerk of Court is respectfully directed to terminate the motion, Doc. 22.

Dated:    August 13, 2021
          New York, New York

_____
          EDGARDO RAMOS, U.S.D.J.